UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

P. CHRISTOPHER LEARY,

                Plaintiff,            COMPLAINT

      - against -

                                    PLAINTIFF DEMANDS
WAFRA INVESTMENT ADVISORY        A TRIAL BY JURY
GROUP, INC.; WAFRA INTERVEST
CORPORATION and FAWAZ AL-
MUBARAKI,

                Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

           Plaintiff   P. Christopher Leary ("Leary" or "plaintiff"), by his attorneys, Vladeck, Raskin & Clark, P.C., complains of defendants Wafra Investment Advisory Group, Inc. and the Wafra Intervest Corporation (collectively "Wafra") and Fawaz Al-Mubaraki ("Al-Mubaraki"), hereinafter referred to collectively as "defendants," as follows:

## NATURE OF THE ACTION

           1.      Plaintiff brings this action to remedy defendants' unlawful interference with the exercise of plaintiff's rights, and discrimination and retaliation against him for attempting such exercise, in violation of the Family and Medical Leave Act, 29 U.S.C. § 2601 et seq. ("FMLA").

           2.      Plaintiff also brings this action to remedy discrimination in the terms, conditions, and privileges of employment based on his age, his actual disability, and his being regarded as disabled, in violation of the New York State Human Rights Law, Executive Law § 296 et seq. (the "State Law"); and the New York City Human Rights Law, N.Y.C. Administrative Code, § 8-101 et seq. (the "City Law").

3.     In addition plaintiff brings this action to remedy defendants' retaliation against plaintiff for his opposition to defendants' unlawful practices in violation of the State Law and the City Law.

4.     Leary is a 57 year old investment professional who has worked in the industry for over 35 years. He began working for Wafra in February of 1999 and worked there for approximately 18 years as the Head of Securities, managing $2.5 billion in global assets. Throughout Leary's 18 years working at Wafra, his investment choices often outperformed industry benchmarks, and he brought many investment opportunities to Wafra, including two of its most high profile investments.

5.     Beginning in or around June of 2014, Wafra created the position of Chief Investment Officer and appointed Al-Mubaraki to the position. As a result he became Leary's supervisor. Shortly thereafter, in or around July 2014, Al-Mubaraki began making negative comments about Leary's age and ability to perform his job. In a meeting with Leary and others, Al-Mubaraki stated in sum and substance that he wanted to hire "a guy" younger than Leary, around 35 to 40 years old. In that meeting, Al-Mubaraki also told another one of Leary's co-workers, Richard Safranek ("Safranek"), that Safranek was too old to pick stocks.

6.     On February 15, 2016, plaintiff was diagnosed with Arterial Fibrillation ("AFIB") which is a "quivering or irregular heartbeat that can lead to blood clots, stroke, heart failure and other heart-related complications."[1] As a result of this condition, on February 18, 2016, Leary suffered a stroke and was hospitalized. Despite his condition, Leary was released from the hospital on February 20, 2016 and returned to work four days later.

---

[1] http://www.heart.org/HEARTORG/Conditions/Arrhythmia/AboutArrhythmia/What-is-Atrial-Fibrillation-AFib-or-AF_UCM_423748_Article.jsp#

7.     Between February 2016 and July 2016, Leary developed and suffered from depression and anxiety due to the stress of living with AFIB and the pressure that defendants imposed with respect to his responsibilities at Wafra. Leary therefore missed several days of work in July. In conjunction with his doctor, Leary made the decision to go on FMLA leave and notified defendants. Wafra approved Leary's FMLA leave, which he began on July 11, 2016.

8.     Leary returned to work on September 12, 2016 to find that his official responsibilities as Head of Securities had been reduced. Many of these duties were given to his younger supervisee, Mitch Williams ("Williams").

9.     On or about July 12, 2017 Al-Mubaraki came to Leary's office to talk about Leary's role at Wafra. Al-Mubaraki told Leary that he was "too old" for his job and that because of his health he should not be coming to the office every day. Al-Mubaraki told Leary that he would work with Wafra's attorneys to come up with a new advisory position for Leary to reduce his responsibilities as Head of Securities at Wafra. That same day Leary reached out to Human Resources to complain about Al-Mubaraki's discriminatory comments and plans to demote Leary to an advisory position.

10.    On August 29, 2017 Leary was terminated from his position as Head of Securities at Wafra. Defendants gave Leary's job to Williams.

## PARTIES

11.    Leary is a resident of Connecticut.

12.    With offices in New York, California, Texas, Kuwait, Ireland, Luxembourg, Germany and Bermuda, Wafra Investment Advisory Group ("Wafra Investment

3

Advisory") is a global investment firm with approximately 155 employees, including 97 investment professionals. Wafra Investment Advisory is headquartered and has its principle place of business in New York City, managing approximately $20 billion in assets under management.

13.     Wafra Intervest Corporation ("Wafra Intervest") is the holding company for Wafra Investment Advisory Group and Wafra Fund Management Limited. Wafra Intervest and its subsidiaries are corporations beneficially owned by the Public Institution for Social Security of Kuwait. Wafra Intervest is incorporated in the Cayman Islands with its principle place of business, Wafra Investment Advisory, located in New York City. Wafra Intervest regularly transacts business in New York through its subsidiary Wafra Investment Advisory.

14.     Fawaz Al-Mubaraki is the Chief Executive Officer and Chief Investment Officer of Wafra Investment Advisory. He resides in New York City and works out of Wafra's New York City headquarters.

## JURISDICTION AND VENUE

15.     Jurisdiction of this Court is proper under 28 U.S.C. § 1331 and 29 U.S.C. § 2617. In addition, as plaintiff is a resident of Connecticut and defendants' headquarters and principle place of business is located in New York City, and more than $75,000 is at issue, the jurisdiction of this Court is proper under 28 U.S.C. § 1332 and New York Civil Practice Law and Rules §§ 301 and 302.

16.     The Court has supplemental jurisdiction over plaintiff's State Law and City Law claims pursuant to 28 U.S.C. § 1367 because these claims closely relate to his FMLA claims

4

and arise from a common nucleus of operative facts, such that all claims form part of the same case or controversy.

17.     Venue is proper within the Southern District of New York pursuant to 28 U.S.C. § 1391 because defendants are headquartered and regularly do business in this District.  In addition, a substantial part of the events or omissions giving rise to plaintiff's claims occurred within the Southern District of New York.

18.     Pursuant to § 8-502(c) of the City Law, prior to filing the Complaint, plaintiff served a copy of this Complaint on the City of New York Commission on Human Rights and the Corporation Counsel of the City of New York.

## FACTUAL ALLEGATIONS

### Background

19.     Leary is a 57 year old investment professional who has focused his career on building asset management platforms and providing well-structured investments to fit his customers' needs and risk profiles. He has worked in the industry for over 35 years and began his career in 1982 at The United States Trust Company as an Assistant Vice President.

20.     In 1987 Leary left the United States Trust Company to become a Vice President and Portfolio Manager at Equitable Capital Management. There, Leary managed a portfolio of investment grade debt up to intermediate maturities and oversaw a trading department working primarily with money market funds, annuities and pension accounts.

21.     In 1990, Leary left Equitable Capital Management to become a Vice President and Portfolio Manager of Fixed Income at SunAmerica Asset Management ("SunAmerica"). SunAmerica promoted Leary to Director of Fixed Income in 1995 and

5

promoted him again a year later to Senior Vice President and Head of the Investment Department. Leary remained at SunAmerica until February 1999 when he left to work for Wafra. He remained there for approximately 18 years until defendants unlawfully terminated his employment.

22.     Within six months of his arriving at Wafra, Leary was promoted to Executive Vice President and Head of Securities. His responsibilities included managing $2.5 billion in global assets and supervising a department of approximately a dozen investment professionals who reported directly to him. By reorganizing the investment process; requiring a complete evaluation of accounts, guidelines, and objectives; and restructuring the department, Leary developed an investment process consistent with specified account objectives and guidelines.

<u>Al-Mubaraki's Promotion to a Supervisory Role Over Leary – Discrimination Begins</u>

23.     In or around June of 2014 Wafra created the position of Chief Investment Officer and appointed Al-Mubaraki. Prior to this promotion, Al-Mubaraki reported directly to Leary and, separately, headed the Alternative Investment Division ("AID"). That reporting structure remained in place from 1999 to 2005 when Al-Mubaraki stopped reporting to Leary and the AID became Al-Mubaraki's only responsibility. Beginning in or around July 2014, however, after Al-Mubaraki's promotion, Leary began reporting directly to Al-Mubaraki until Leary's discharge in August 2017.

24.     Almost immediately after becoming Leary's supervisor, Al-Mubaraki began commenting negatively on Leary's age and ability to perform his job. On Monday, June 30, 2014, Leary, Al-Mubaraki, and several other employees had a meeting regarding the potential hiring of an additional employee. At this meeting, Al-Mubaraki said in sum and

6

substance: "although Vincent [Campagna – Chief Operating and Compliance Officer ("Campagna")] does not like me saying it, I want to hire a guy younger than [Leary], 35 to 40." In this same meeting, Al-Mubaraki commented on another employee's age, stating in sum and substance: "I told [Safranek] he is too old to pick stocks."

25.     In or around January of 2015 Wafra hired Williams (in his mid 40s) to be Head of Equities and to report directly to Leary. Thereafter, Williams hired three new employees and increased the salary budget by approximately $700,000. Going behind Leary's back, Williams sought approval for this increase in salary and expenses directly from Al-Mubaraki.

### FMLA Leave Begins – Leary's Role Diminished as a Result

26.     On February 15, 2016, Leary was diagnosed with AFIB. AFIB occurs when "the upper chambers of the heart (the atria) beat irregularly (quiver) instead of beating effectively to move blood into the ventricles." Because of the irregularity in heartbeats, "[i]f a clot breaks off, enters the bloodstream and lodges in an artery leading to the brain, a stroke results."[2]

27.     As a result of the AFIB, Leary suffered a stroke on February 18, 2016 and was hospitalized. Leary was treated at Greenwich Hospital and released on February 20, 2016. On February 24, 2016, Leary returned to work. Following this trauma, Leary was, and still is, required to take prescription medications daily, have periodic blood tests taken, and to meet with a cardiologist quarterly to monitor his heart condition.

28.     Following his hospitalization, Leary developed stress-induced depression and anxiety related to his illness and job. Due to his deteriorating condition, Leary could not

---

[2] Id.

7

attend work for a number of days in or around July 2016 and consulted his doctor. His doctor and Leary determined that Leary would need to take a medical leave from Wafra to combat his growing anxiety and depression.

29.    After consulting with the Wafra Human Resources Department and learning of his rights under FMLA, Leary notified Wafra of his intention to seek FMLA leave and provided the necessary documentation. Wafra approved Leary's leave which effectively began on July 11, 2016.

30.    While Leary was on FMLA leave, Wafra began reducing Leary's role as Head of Securities. Shortly after Leary began his leave, Wafra removed Leary from the Maritime Finance Board, a client that Leary found and as to which Leary had significant responsibilities. Wafra never communicated its decision until Leary returned from his leave and asked when the next Maritime Finance Board meeting would take place.

31.    In addition, during Leary's leave, Al-Mubaraki: relieved Leary of his oversight of the Maritime Investment account and placed it in the AID under his own supervision; severely diminished Leary's oversight of his direct reports by taking away his ability to approve expenses and travel; and gave responsibility for a new Securities Exchange Traded Fund product to Williams, even though Leary had worked successfully in that area for years. Al-Mubaraki never included Leary in those discussions or decisions. During Leary's FMLA leave, Wafra told Williams to report directly to Al-Mubaraki and circulated a memo throughout Wafra announcing that Williams would temporarily assume Leary's position as Head of Securities.

32.    Leary returned from his FMLA leave on September 12, 2016. Leary learned that Wafra had diminished his duties and responsibilities as Head of Securities. Al-Mubaraki instructed Williams to continue to report directly to him and bypass Leary. No memo

8

circulated to announce Leary's return to his position as Head of Securities or to remove Williams' duties in that role. While Leary technically was still Head of Securities, and thereby still responsible for his direct reports, many of Leary's staff members were instructed to go directly to Al-Mubaraki for approval of any expenses, travel, or other business decisions.

33.    Despite Leary's diminished role, the overall performance of Leary's department improved between September 2016 and July 2017. In fact, because he continued to work hard, Wafra, in March 2017, gave Leary a $25,000 raise retroactive to January 2017, and a bonus exceeding the bonus he received in 2016. The recognition for Leary's work, however, was short-lived, as Wafra continued to discriminate against Leary.

<u>Al-Mubaraki's Plans to Change Leary's Position Due to Leary's Age and Disability</u>

34.    In or around June 2017, Wafra's legal counsel provided equal employment opportunity training to senior staff members over the course of two sessions. Al-Mubaraki did not attend either session.

35.    On July 12, 2017 Al-Mubaraki came to Leary's office to discuss Al-Mubaraki's plans for Leary's employment. Al-Mubaraki said that he thought Leary was too old to be doing this job, and that, given Leary's health problems, he should not be coming to the office every day. Al-Mubaraki also told Leary that he needed the "skills of someone who was not 70, but also not 30." Al-Mubaraki explained that he would work with the company's lawyers to develop a position for Leary to be an advisor to the Securities Department. Leary understood that he could not be both the Head of Securities and an Advisor to the Securities Department, and that should this new advisory position be created, he would be demoted from Head of Securities.

36.    Based on the instructions given in the equal employment opportunity training, Leary contacted Robyn Padrone ("Padrone") in Human Resources to complain about

9

Al-Mubaraki's comments on Leary's age and health. Leary made it clear to Padrone that he believed Al-Mubaraki's comments were discriminatory and that Al-Mubaraki's plans to move him to a new position were directly related to Leary's age, heart condition, anxiety and depression.

37.     During a call on August 2, 2017, Padrone told Leary that she discussed with Al-Mubaraki his complaint. She said that although Al-Mubaraki confirmed that the discussion about the new advisory position had taken place, Al-Mubaraki denied commenting on Leary's age and disability. Leary sent a follow-up e-mail to Padrone in which he reiterated that the July 12, 2017 meeting was not the first time Al-Mubaraki had referred negatively to Leary's age, and that Leary hoped that Al-Mubaraki's comments were not foreshadowing plans to diminish Leary's role further because of his age, disability, and having taken FMLA leave a year earlier.

## Setting the Stage for Leary's Termination

38.     On August 25, 2017 Leary went to lunch to discuss business issues with a colleague who worked in the compliance department. During lunch Leary and his colleague each had two glasses of wine over the course of a two hour meal. Following lunch, Leary went to Padrone to discuss whether Williams, still technically Leary's direct report, could request a flexible work schedule. Leary and Padrone spoke for approximately ten minutes without incident, at which point Leary returned to his own office.

39.     Approximately five minutes later, Padrone entered Leary's office, closed the door, and asked Leary if he had been drinking. Padrone stated that if he had been drinking, she did not want him speaking to anyone else in the office. Leary told Padrone that he had drunk two glasses of wine at lunch, but that, as a six foot tall, 300 pound man, he was not intoxicated

10

nor even remotely impaired. Leary told Padrone, however, that if she wanted him to leave, he would go home early since she did not want him interacting with anyone else in the office. Padrone agreed and Leary left the office that day at 3:30 p.m.

40. On August 29, 2017, Campagna and Padrone called Leary into a meeting and informed him that Wafra had terminated his employment. They handed Leary a termination letter and told him that August 29, 2017 would be his last day. While the termination letter outlined no basis for the termination, Campagna and Padrone told Leary that there were three reasons for his termination: 1) loss of the Kuwait Investment Authority account in March 2017; 2) poor performance; 3) intoxication. These reasons were pretextual.

41. While Wafra did lose the Kuwait Investment Authority account in March 2017, this represented only $400,000 out of the $6 million in fees Leary brought in to the firm. In fact, Wafra was already on notice that the Kuwait Investment Authority intended to close its Wafra account for reasons not related to Leary's performance. Wafra did not decrease Leary's new salary or bonus despite this loss.

42. In addition, Leary's performance continued at a high level after having come back from leave. After only six months back on the job, Wafra awarded Leary not only a raise retroactive to January 2017, but a higher bonus than he received the prior year.

43. Lastly, Leary was neither intoxicated nor impaired in any respect following his lunch on August 25, 2017. Leary is a 300 pound male who had two glasses of wine over the course of two hours while eating lunch. He chose to go to Padrone's office, which he would not have done had he been even slightly intoxicated, and they had a full conversation for ten minutes without Padrone's saying a word about Leary's drinking. Wafra used this encounter as a pretext for Leary's discharge.

11

## FIRST CAUSE OF ACTION

### (FMLA - INTERFERENCE)

44.     Plaintiff repeats and realleges paragraphs 1 through 43 as if fully set forth herein.

45.     By the acts and practices described above, defendants interfered with, restrained, and denied plaintiff his rights under the FMLA, in violation of the FMLA, 29 U.S.C. § 2615(a)(1).

46.     Defendants knew that their actions violated the FMLA; defendants' violations of the FMLA were willful and not in good faith.

47.     As a result of defendants' actions, plaintiff has suffered and will continue to suffer irreparable injury and other monetary damages unless and until this Court grants relief.


## SECOND CAUSE OF ACTION

### (FMLA – RETALIATION)

48.     Plaintiff repeats and realleges paragraphs 1 through 47 as if fully set forth herein.

49.     By the acts and practices described above, defendants retaliated against plaintiff for attempting to exercise his rights, in violation of the FMLA, 29 U.S.C. § 2615(a)(2).

50.     Defendants knew that their actions violated the FMLA; defendants' violations of the FMLA were willful and not in good faith.

51.     As a result of defendants' actions, plaintiff has suffered and will continue to suffer irreparable injury and other monetary damages unless and until this Court grants relief.

868482 v 1

## THIRD CAUSE OF ACTION

### (STATE LAW – AGE DISCRIMINATION)

52.    Plaintiff repeats and realleges paragraphs 1 through 51 as if fully set forth herein.

53.    By the acts and practices described above, defendants discriminated against plaintiff in the terms and conditions of his employment on the basis of his age in violation of the State Law, Executive Law §§ 296 (1)(a) and (3-a)(a).

54.    Defendants knew their actions were in violation of the law; defendants' actions were willful and malicious.

55.    As a result of defendants' actions, plaintiff suffered and will continue to suffer irreparable injury, monetary damages, mental anguish, emotional distress, humiliation and damage to his reputation unless and until this Court grants relief.

## FOURTH CAUSE OF ACTION

### (STATE LAW – ACTUAL DISABILITY)

56.    Plaintiff repeats and realleges paragraphs 1 through 55 as if fully set forth herein.

57.    By the acts and practices described above, defendants discriminated against plaintiff in the terms and conditions of his employment on the basis of his disability in violation of the State Law, Executive Law § 296 (1)(a) and Executive Law § 292 (21)(a).

58.    Defendants knew their actions were in violation of the law; defendants' actions were willful and malicious.

59.    As a result of defendants' actions, plaintiff suffered and will continue to

13

suffer irreparable injury, monetary damages, mental anguish, emotional distress, humiliation and damage to his reputation unless and until this Court grants relief.

### FIFTH CAUSE OF ACTION

### (STATE LAW – REGARDED AS DISABLED)

60. Plaintiff repeats and realleges paragraphs 1 through 59 as if fully set forth herein.

61. By the acts and practices described above, defendants discriminated against plaintiff in the terms and conditions of his employment on the basis of his being regarded as disabled in violation of the State Law, Executive Law § 296 (1)(a) and Executive Law § 292 (21)(c).

62. Defendants knew their actions were in violation of the law; defendants' actions were willful and malicious.

63. As a result of defendants' actions, plaintiff suffered and will continue to suffer irreparable injury, monetary damages, mental anguish, emotional distress, humiliation and damage to his reputation unless and until this Court grants relief.

### SIXTH CAUSE OF ACTION

### (STATE LAW – RETALIATION)

64. Plaintiff repeats and realleges paragraphs 1 through 63 as if fully set forth herein.

65. By the acts and practices described above, defendants retaliated against plaintiff for his opposition to defendants' unlawful employment practices in violation of the State

14

868482 v 1

Law. Executive Law §§ 296 (1)(e) and (7).

66.    Defendants knew their actions were in violation of the law; defendants' actions were willful and malicious.

67.    As a result of defendants' retaliatory acts, plaintiff has suffered and will continue to suffer irreparable injury, monetary damages, mental anguish, emotional distress, humiliation, and damage to his reputation unless and until this Court grants relief.

## SEVENTH CAUSE OF ACTION

### (STATE LAW – AIDING AND ABETTING)

68.    Plaintiff repeats and realleges paragraphs 1 through 67 as if fully set forth herein.

69.    By the acts and practices described above, defendants aided and abetted each other in discriminating against plaintiff on the basis of his age, actual disability and for being regarded as disabled, and in retaliating against plaintiff for his opposition to defendants' unlawful employment practices, in violation of the State Law, Executive Law § 296 (6).

70.    Defendants knew their actions were in violation of the law; Defendants' actions were willful and malicious.

71.    As a result of defendants' acts, plaintiff has suffered and will continue to suffer irreparable injury, monetary damages, mental anguish, emotional distress, humiliation, and damage to his reputation unless and until this Court grants relief.

15

868482 v1

## EIGHTH CAUSE OF ACTION

### (CITY LAW – AGE DISCRIMINATION)

72.     Plaintiff repeats and realleges paragraphs 1 through 71 as if fully set forth herein.

73.     By the acts and practices described above, defendants discriminated against plaintiff in the terms and conditions of his employment on the basis of his age in violation of New York City Administrative Code § 8-107 (1)(a)(3).

74.     Defendants knew their actions were in violation of the law; defendants' actions were willful and malicious.

75.     As a result of defendants' actions, plaintiff suffered and will continue to suffer irreparable injury, monetary damages, mental anguish, emotional distress, humiliation and damage to his reputation unless and until this Court grants relief.

## NINTH CAUSE OF ACTION

### (CITY LAW – ACTUAL DISABILITY)

76.     Plaintiff repeats and realleges paragraphs 1 through 75 as if fully set forth herein.

77.     By the acts and practices described above, defendants discriminated against plaintiff in the terms and conditions of his employment on the basis of his disability in violation of New York City Administrative Code § 8-107 (1)(a)(3).

78.     Defendants knew their actions were in violation of the law; defendants' actions were willful and malicious.

16

79.     As a result of defendants' actions, plaintiff suffered and will continue to suffer irreparable injury, monetary damages, mental anguish, emotional distress, humiliation and damage to his reputation unless and until this Court grants relief.

### TENTH CAUSE OF ACTION

### (CITY LAW – PERCEIVED DISABILITY)

80.     Plaintiff repeats and realleges paragraphs 1 through 79 as if fully set forth herein.

81.     By the acts and practices described above, defendants discriminated against plaintiff in the terms and conditions of his employment on the basis of a perceived disability in violation of New York City Administrative Code § 8-107 (1)(a)(3).

82.     Defendants knew their actions were in violation of the law; defendants' actions were willful and malicious.

83.     As a result of defendants' actions, plaintiff suffered and will continue to suffer irreparable injury, monetary damages, mental anguish, emotional distress, humiliation and damage to his reputation unless and until this Court grants relief.

### ELEVENTH CAUSE OF ACTION

### (CITY LAW – RETALIATION)

84.     Plaintiff repeats and realleges paragraphs 1 through 83 as if fully set forth herein.

17

85.     By the acts and practices described above, defendants have retaliated against plaintiff for his opposition to defendants' unlawful employment practices in violation of the City Law, New York City Administrative Code § 8-107(7).

86.     Defendants knew their actions were in violation of the law; defendants' actions were willful and malicious.

87.     As a result of defendants' retaliatory acts, plaintiff has suffered and will continue to suffer irreparable injury, monetary damages, mental anguish, emotional distress, humiliation, and damage to his reputation unless and until this Court grants relief.


TWELFTH CAUSE OF ACTION

(CITY LAW – AIDING AND ABETTING)

88.     Plaintiff repeats and realleges paragraphs 1 through 87 as if fully set forth herein.

89.     By the acts and practices described above, defendants aided and abetted each other in discriminating against plaintiff on the basis of his age, actual disability and for being regarded as disabled, and in retaliating against plaintiff for his opposition to defendants' unlawful employment practices, in violation of the City Law, New York City Administrative Code § 8-107(6).

90.     Defendants knew their actions were in violation of the law; defendants' actions were willful and malicious.

91.     As a result defendants' acts, plaintiff has suffered and will continue to suffer irreparable injury, monetary damages, mental anguish, emotional distress, humiliation, and damage to his reputation unless and until this Court grants relief.


18

## PRAYER FOR RELIEF

WHEREFORE, plaintiff respectfully requests that this Court enter a judgment:

a.      declaring that the acts and practices complained of herein are in violation of the FMLA, the State Law and the City Law;

b.      enjoining and permanently restraining these violations of the FMLA, the State Law and the City Law;

c.      directing defendants to take such affirmative action as is necessary to ensure that the effects of these unlawful employment practices are eliminated and do not continue to affect plaintiff;

d.      directing defendants to place plaintiff in the position he would have occupied but for defendants' unlawful discriminatory and retaliatory conduct and to make him whole for all earnings and other benefits he would have received but for defendants' unlawful treatment, including, but not limited to, wages, bonuses, pension, and other lost benefits;

e.      directing defendants to pay plaintiff an additional amount as liquidated damages under the FMLA;

f.      directing defendants to pay plaintiff compensatory damages, including damages for mental anguish, humiliation, and pain and suffering and interest thereon under the State Law and City Law;

g.      directing defendants to pay plaintiff punitive damages for their intentional disregard of and/or reckless indifference to plaintiff's statutory rights under the City Law;

h.      awarding plaintiff such interest as is allowed by law and damages to compensate for any adverse tax consequences of any award;

19

868482 v1

i.      awarding plaintiff the costs of this action together with reasonable attorneys'

fees;

j.      awarding such other and further relief as this Court may deem necessary and

proper.

<u>DEMAND FOR TRIAL BY JURY</u>

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, plaintiff demands a

trial by jury in this action.

Dated:  New York, New York
       January 3, 2018

VLADECK, RASKIN & CLARK, P.C.

By:    _____

Debra L. Raskin
Attorney for Plaintiff
565 Fifth Avenue, 9th Floor
New York, New York  10017
(212) 403-7300

868482 v1